IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(Wichita Docket)

FILED
U.S. District Court
District of Kansas

DEC 19 2016

Clerk, U.S. District Court
By _____ Deputy Clerk

UNITED STATES OF AMERICA,

                Plaintiff,

v.

CARLOS FRANCISCO MARTIN,

                Defendant.

Case Number: 16-M-6189-01-KGG

~~FILED UNDER SEAL~~

### ~~SEALED~~ CRIMINAL COMPLAINT

I, Federal Bureau of Investigation Task Force Officer Christopher L. Roubideaux, being duly sworn, state the following is true and correct to the best of my knowledge and belief, and establishes probable cause that the following offenses have been committed:

### COUNT 1

On or about December 19, 2016, in the District of Kansas, the defendant,

**CARLOS FRANCISCO MARTIN**,

attempted to receive, in interstate or foreign commerce, an explosive with the knowledge or intent that it would be used to intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property.

All in violation of Title 18, United States Code, Sections 2 & 844(d).

I, Christopher L. Roubideaux, a Task Force Officer with the FBI, being first duly sworn, hereby depose and state:

## INTRODUCTION

1. This Affidavit is offered in support of a criminal complaint charging **CARLOS FRANCISCO MARTIN** with a violation of federal arson/explosives statutes (18 U.S.C. § 844(d)).

2. Recently the Federal Bureau of Investigation (FBI) learned that a person later learned to be the defendant, **CARLOS FRANCISCO MARTIN**, used a certain screen name or moniker to access a certain website, he communicated with another individual who also used a screen name or moniker, and he ordered a certain type of explosive device to be delivered to his home in Coffeyville, Kansas.[1] The FBI conducted a controlled delivery of an inert explosive device to the address indicated when the device was ordered by the defendant (using moniker #1). The defendant was arrested when he took delivery of the package, took it inside the residence, and opened it.

3. Based on my training and experience, and the facts set forth in this Affidavit, I believe there is probable cause that violations of federal law have been committed in the District of Kansas.

---

[1] In order to preserve the FBI's ability to continue conducting similar investigations in the future, I will refer to the website as "**Website #1**," to the defendant's screen name or moniker as "**Moniker #1**," and to the other individual's screen name or moniker as "**Moniker #2**." I will also refer to something that I call "**Cyber Network #1**," which I will explain below. Although the specific type of explosive device was discussed by the participants in the transaction, I believe that disclosing the specific type of device might compromise the FBI's ability to conduct similar such investigations in the future. For that reason, I will refer to it generally as an "explosive" or "explosive device" and will substitute "[explosive]" for specific reference to the device.

4. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers, federal agents, and witnesses. Because this Affidavit is being submitted to support only a finding of probable cause, I have not set forth all of my knowledge regarding the investigation.

## BACKGROUND OF AFFIANT

5. I have been a certified law enforcement officer with the Kansas Highway Patrol (KHP) since March 17, 1994, and I am currently assigned to the United States Department of Justice, Federal Bureau of Investigation (FBI), Kansas City Division Joint Terrorism Task Force (JTTF) of the FBI where I am responsible for conducting investigations in a variety of criminal matters pertaining to National Security, International Terrorism, and Domestic Terrorism. As a Joint Terrorism Task Force Officer, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), authorized to investigate violations of Federal law and to execute warrants issued under the authority of the United States. I am empowered to conduct investigations of Federal felony offenses to include but not limited to those involving the attempt to transport or receive, in interstate or foreign commerce an explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property as enumerated in Title 18, United States Code, Section § 844(d).

## BACKGROUND OF THE CASE

6. Approximately two weeks ago, the FBI was informed that a person using **Moniker #1** had accessed an online marketplace known as **Website #1** to place an order for certain explosive materials. **Website #1** marketplace is an online sales platform that enables vendors and buyers who are users of the site to conduct anonymous transactions online involving

3

the sale of a variety of illegal goods, including but not limited to biological agents, toxins, chemicals, firearms, ammunition, explosives, narcotics and counterfeit goods.  The basic user interface of **Website #1** resembles those of other well-known online marketplaces, such as ebay.com and Amazon.com.  However, unlike mainstream e-commerce websites, **Website #1** is only accessible on the **Cyber Network #1**.

7. Every computer device on the Internet has an Internet protocol or "IP" address assigned to it, which is used to route Internet traffic to and from the device.  Ordinarily, a device's IP address can be used to determine its physical location and, thereby, its user.  The **Cyber Network #1**, however, enables its users to hide their identities, as well as their physical locations.

8. In essence, the **Cyber Network #1** is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true IP addresses of the computers on the network and, thereby, the identities of the network's users.

9. Although **Cyber Network #1** has known legitimate uses, it is also known to be used by cybercriminals seeking anonymity in their illicit online activities.  Every communication sent through **Cyber Network #1** is transferred through numerous relays within the network, and concealed in numerous layers of encryption, such that its users believe that it is virtually impossible to trace the communication back to its true, originating IP address.

10. Similarly, **Cyber Network #1** enables websites to operate on the network in a way that conceals the true IP address of the computer servers hosting the websites, thereby making it extremely difficult to identify the server's physical location.

11. Illicit websites operating on **Cyber Network #1** have complex web addresses, generated by a specific computer algorithm.  These websites can be accessed only by using

**Cyber Network #1** browser software which is publicly available and may be downloaded by prospective users from the Internet.

12. Individual users who establish buyer and or seller accounts on the **Website #1** marketplace have the ability to communicate with one another with a built in private messaging feature. The private messaging feature is more similar in fashion to an email account where the messages are sent and received and can be retrieved even if the user is not logged in at the time the message was sent. The private messaging feature is conducted in clear text whereas a site administrator on **Cyber Network #1** could possibly review the content of the communication. In order to prevent others such as a site administrator from **Cyber Network #1** viewing the message, it is common practice for buyers and sellers to encrypt their private messages.

13. The primary form of payment used on certain internet sites, including **Website #1**, is a digital currency known as bitcoins (BTC). BTC are a decentralized form of digital "crypto" currency, existing entirely on the internet and not in any physical form. The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operating on a "peer to peer" network. BTC transactions are processed collectively by the computers composing the network.

14. While BTC have known legitimate uses, they are also known by law enforcement to be utilized by cyber criminals given the ease with which they can be used to move money in relative anonymity.

15. Generally, in order to acquire BTC, a user must purchase them from a BTC "exchanger." In return for a commission, BTC exchangers accept payments of currency in some conventional form (cash, wire transfer, etc.) and exchange the money for a corresponding number of BTC, based on a fluctuating exchange rate. Exchangers also accept payments of BTC

and exchange the BTC back to conventional currency again, charging a commission for the service.

16. Once a user acquires BTC from an exchanger, the BTC are kept in a virtual "wallet" associated with a BTC "address" designated by a complex string of letters and numbers. The "address" is analogous to the account number for a bank account, while the "wallet" is analogous to a bank safe where the money in the account is physically located. Once a BTC user funds his wallet, the user can then use BTC in the wallet to conduct financial transactions by transferring BTC from his BTC address to the BTC address of another user over the internet.

17. **Website #1**'s payment system essentially consists of a BTC "bank" internal to the marketplace, where **Website #1** users must hold an account in order to conduct transactions on the site.

18. In order to post listings on **Website #1**, a vendor must first establish a seller's profile. In order to make a purchase on **Website #1** from a vendor on the site, a user must establish an account on **Website #1**, and then transfer his BTC to a BTC address associated with the user's **Website #1** account.

19. After funding one's account, the user then can make purchases from **Website #1** vendors. When the user purchases an item on **Website #1**, the BTC needed for the purchase are held in escrow in a virtual wallet maintained by **Website #1** pending the completion of the transaction.

## PROBABLE CAUSE

20. Beginning on November 27, 2016, the FBI initiated an investigation on **Moniker #1**'s purchasing activity on **Website #1**.

21. From on or about November 27, 2016, through on or about December 13, 2016, **Moniker #2**, who is located out of state, logged on to the **Moniker #2**'s account on the "Website #1." On or about November 27, 2016, **Moniker #2** observed an unsolicited private message sent by **Moniker #1**. The private message was titled "[explosive]."

22. In late November 2016, **Moniker #2** received an unsolicited message from **Moniker #1**" inquiring about the purchase of an explosive device. The FBI has obtained transcripts of the conversation between **Moniker #1** and **Moniker #2** on **Website #1**. The original message that **Moniker #1** sent to **Moniker #2** contained the following language:

> *"Hey I need explosive I can throw and be impressed with how much for a [explosive]?"*

23. On or about December 1, 2016, **Moniker #2** responded by asking how many of the explosives **Moniker #1** wanted and what was the delivery location. **Moniker #1** replied with the following:

> *"Coffeyville, KS 67337*
> *2 [explosives]"*

24. In response, **Moniker #2** advised **Moniker #1** that he/she would ship the explosive packaged inside of a toy.

25. On or about December 3, 2016, **Moniker #1** inquired about the price for one explosive and stated the following:

> *"I have .1167 bitcoin is that enough for 1? If not how much for 1"*

26. On the same day, **Moniker #2** replied to **Moniker #1** offering to sell the **[explosive]** for BTC .165, including postage to the United States. In response, **Moniker #1** stated the following:

> *"yea sounds good I won't be able to get more till Monday"*

7

27.  On or about December 6, 2016, **Moniker #1** purchased one (1) item from **Moniker #2** on website#1 for the amount of BTC .1644. On December 6, 2016, BTC .1644 was equivalent to approximately $123.48 USD. **Moniker #2** received a sale summary for the purchase which revealed the item to be the [explosive]. In the buyer notes of the sale summary **Moniker #1** provided the following delivery information:

> *Carlos Martin*
> *408 W North ST*
> *Coffeyville KS, 67337*
> *United States of America*

28.  A review of the purchase order revealed **Moniker #1** has placed twenty-seven (27) orders on **Website #1**, totaling BTC 5.9225. On December 6, 2016, BTC 5.9225 was equivalent to approximately $4,448.62 USD.

29.  After the purchase, **Moniker #2** continued to communicate with **Moniker #1** about the purchase. On 12/6/2016, **Moniker #1** stated:

> *"Just ordered it… I've never used a [explosive] before…"*

30.  On December 7, 2016, **Moniker #1** stated the following regarding the intended use of the explosive:

> *"This first one I want to go out and try somewhere I got a place in the middle of no where to try it out …Can you tell me what I do to make it live? Also do you have anything with a detonator like I could place walk away and then explode?"*

31.  **Moniker #1** went on to state the following regarding the use of explosives:

> *"I want to get an explosive I can detonate next time but I want it to do the same or more damage than the [explosive].. I just wanted to know what I could expect after I tried the [explosive]." "I want to sneak up put it on truck and use from a safe distance. I want to blow up a truck"*

32.  The next day, **Moniker #1** stated the following regarding the purchase of additional explosive devices:

> *"I'm very excited to try the [explosive] by the way… but yea I'm wanting a explosive with a time delay..I don't know much about using something like that..i would really like to try though. again I'll probably by 2 time delays so i can try it out first.. I would want them to have about a 5 min time delay… I want to try the [explosive],,,then in 2-4 weeks buy 3 of the time delay explosives for 150 euros…is it all put together just light the fuse?"*

33.     **Moniker #2** advised **Moniker #1** that the package would be put in the mail with a delivery date of December 19, 2016.

34.     On December 19, 2016, the FBI conducted a controlled delivery of a package at 408 W. North Street, Coffeyville, Kansas by the United States Postal Service. The package contained an inert version of the explosive device that **Moniker #1** had ordered on **Website #1** from **Moniker #2**. The package was received and signed for at approximately 9:10 am on December 19, 2016, by the defendant, Carlos Francisco Martin. The package contained a device designed to notify agents when the package was opened, and agents had obtained a warrant allowing them to enter the premises and arrest whomever had opened the package. Shortly after the defendant took receipt of the package, agents received notification that the package had been opened. Agents immediately entered the residence and arrested the defendant.

35.     After his arrest, the defendant was interviewed by agents. The defendant admitted to ordering an explosive device off the internet, he admitted that he was the intended recipient of the package, and he admitted to accepting the package believing it contained an explosive device.

## CONCLUSION

Based upon the foregoing information, I believe probable cause exists to believe the defendant, Carlos Francisco Martin, has violated 18 U.S.C. § 844(d) – attempt to transport explosives through interstate commerce to intimidate, or to destroy buildings or vehicles.

Christopher L. Roubideaux
Task Force Officer
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence this 19th day of December, 2016, at Wichita, Kansas.

After reviewing this Complaint and the accompanying Affidavit, I find there is probable cause to believe that the defendant, Carlos Francisco Martin, committed the offense charged in this Complaint.

HONORABLE KENNETH G. GALE
U.S. Magistrate Judge

10